# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00585-CV

---

**Judy A. Guyaux, Appellant**

**v.**

**Aaron J. Mitchell; Jennifer K. Mitchell; Michael Mitchell; and Mary Angeline Mitchell, Appellees**

---

### FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 20-1360-C425, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Judy A. Guyaux sued the Walnut Springs Homeowners Association, Inc. (HOA) and appellees, Aaron J. Mitchell, Jennifer K. Mitchell, Michael Mitchell, and Mary Angeline Mitchell, seeking to enforce the restrictive covenants of the Walnut Springs subdivision. Guyaux contends that the Mitchells were seeking to build a second permanent residence on their property in violation of the restrictive covenants, which allow "one single family dwelling" per lot and "[g]uesthouses . . . limited to 750 square feet & limited to one bathroom." Guyaux appeals from the trial court's order granting the Mitchells' motion for summary judgment and motion to sever the claims by and against the Mitchells. For the reasons explained below, we affirm the trial court's judgment.

**BACKGROUND**

The property at issue is part of the Walnut Springs subdivision, which is subject to the "Declaration of Covenants, Conditions, and Restrictions" ("Restrictive Covenants") recorded in the Williamson County plat records. The Restrictive Covenants provide for mandatory property-owner membership in the HOA. The Restrictive Covenants mandate that plans and specifications (i.e., "the documents designed to guide or control the construction or erection of any Improvement") for any improvements to lots in the subdivision must be submitted to and approved in writing by the HOA's Architectural Control Committee.[1]

The Mitchells—Aaron; his wife, Jennifer; his father, Michael; and his mother, Mary Angeline—purchased the property in October 2018.[2] The property had a detached garage in addition to the main residence. In the affidavit submitted with the Mitchells' summary-judgment motion, Aaron attested that "[t]he Property was purchased in part because it had a detached garage that allowed for the construction of a guest house with minimal exterior renovations to the detached garage."

---

[1] As defined in the Restrictive Covenants, an "[i]mprovement" means:

> every structure and all appurtenances thereto of every type and kind, including but not limited to buildings, barns, outbuildings, storage sheds, patios, basketball goals, tennis courts, swimming pools, garages, fences, screening walls, retaining walls, stairs, decks, landscaping, poles, signs, exterior air conditioning, water softener, fixtures or equipment, pumps, wells, tanks, reservoirs, pipes, lines, meters, antennas, towers, wind mills, and any facilities used in connection with water, sanitary sewer, wastewater, septic tank, storm drain, drainage, gas, electric, telephone, regular or cable television or other utilities.

[2] When necessary for clarity, we will refer to the individual Mitchells by their first names.

After what Aaron characterized in his affidavit as "a prolonged effort to get their plans approved" by the Committee, on September 19, 2019, the Mitchells submitted an application to construct guest quarters in the pre-existing 1,368 square-foot detached garage and attached architectural plans showing that the guest quarters would be 750 square feet and would involve minor changes to the exterior of the structure (the "planned improvements").[3] The HOA president informed the Mitchells on September 21, 2019, that their application had been approved by the Committee.[4]

On October 3, 2019, Guyaux filed her suit, bringing claims for violations of the Restrictive Covenants against the Mitchells and for breaches of fiduciary duty against the HOA and seeking declaratory and injunctive relief. Guyaux alleged that the Mitchells were seeking to build a second permanent residence, in addition to the main residence, in violation of the Restrictive Covenants.[5] On November 27, 2019, the Mitchells filed an amended answer, special exceptions, and a counterclaim seeking a declaratory judgment that (1) the guesthouse is allowed

---

[3] Guyaux submitted affidavits with both her petition and her summary-judgment response. She attested that at the time she filed the lawsuit she was a board member of the HOA and had served as a member of the Committee. However, according to Guyaux, on September 17, 2019, the HOA's president "purportedly removed all members of the [Committee] and appointed herself along with the four other [HOA] Board members to be the new interim [Committee] members." Guyaux further attested that "the Mitchells have always represented to the [Committee] that they sought to build a second permanent residence, to permanently house the two elder Mitchells, by renovating the existing garage/workshop on their Lot" and that the Committee "repeatedly denied the Mitchell Defendants' submittals for failure to comply with the restrictive covenants."

[4] The Mitchells' application and the HOA president's email informing them of the Committee's approval were both submitted with Aaron's affidavit as summary-judgment evidence.

[5] The trial court granted Guyaux's application for a temporary restraining order on October 8, setting a temporary-injunction hearing on October 22. After that hearing, the trial court denied Guyaux's application for a temporary injunction on October 28. Guyaux subsequently filed a notice of lis pendens. After the Mitchells filed a motion to expunge lis pendens and for sanctions, the trial court granted the motion to expunge lis pendens in February 2020.

3

under the Restrictive Covenants; or (2) alternatively, even if the guesthouse is not allowed under the Restrictive Covenants, the Committee had properly granted a variance from the restrictions under Article III, Section 4.

That same day, the Mitchells also filed their summary-judgment motion and motion to sever. They sought summary judgment both on Guyaux's claims against them and on their declaratory-judgment claims against Guyaux, explaining that the issues are premised on the same legal arguments. After Guyaux filed her response, the trial court held a hearing on the motion on January 14, 2020, and took the motion under advisement. The trial court granted the Mitchells' motion for summary judgment and motion to sever in one order signed on May 15, 2020. However, the trial court neither notified the parties nor filed the order until September 1, 2020. This appeal followed.

## JURISDICTION

Before turning to the merits of Guyaux's appeal, we first address this Court's jurisdiction. On February 2, 2021, by notice letter, the Court granted Guyaux's motion for extension of time to file her notice of appeal and denied the Mitchells' motion to dismiss for want of jurisdiction.[6] However, because the Mitchells continue to urge that the Court lacks jurisdiction and that Guyaux's appeal was not timely, we address the Mitchells' jurisdictional arguments, provide a brief procedural history of the case on appeal, and explain our prior denial of the Mitchells' motion to dismiss filed in this Court.

---

[6] The Mitchells subsequently filed a motion for rehearing en banc of the Court's denial of their motion to dismiss, which the Court has denied today by separate notice.

4

**Procedural history of appeal**

The order that the trial court sent to the parties on September 1 stated: "It is further ORDERED that the claims by and against the Mitchell Defendants are severed and orders the clerk of the Court to assign the severed action the separate Cause No. _____ which will constitute a final and appealable judgment, disposing of all parties and claims therein." No severed cause number was included in the blank space on the signed order. On September 1, the Mitchells' counsel requested that the trial court include the entire file from the initial cause number "in the new cause once severed and assigned." On September 4, 2020, the matter on appeal was severed out from the prior matter (No. 19-1587-C26) and docketed by the district clerk as a separate cause number, No. 20-1360-C425.

Guyaux filed a motion for new trial on September 30, 2020. She filed her notice of appeal on December 8, 2020.[7] Guyaux then filed a motion to extend time to file her notice of appeal on December 18, 2020. In her motion to extend time, Guyaux asserted that the notice of appeal was originally due on December 3, 2020, making her motion filed within the 15-day period allowed for requesting an extension of time to file a notice of appeal. *See* Tex. R. App. P. 26.3. She asserted that the trial court's interlocutory order became a final judgment when the new matter, No. 20-1360-C425, was severed out and docketed by the district clerk under that new cause number on September 4. Thus, Guyaux argued, her motion for new trial was timely filed on

_____

[7] Guyaux filed a notice of appeal from the trial court's order in both the original trial-court cause (No. 19-1587-C26), which this Court docketed as No. 03-20-00584-CV, and in the severed trial-court cause (No. 20-1360-C425), which we docketed as No. 03-20-00585-CV. The Mitchells filed motions to dismiss in both appeals, and in her response to the motion filed in No. 03-20-00584-CV, Guyaux filed a motion to consolidate the two appeals "to avoid confusion and preserve judicial efficiency moving forward." The Court granted Guyaux's motion to consolidate on January 5, 2021, consolidating the two appeals for all purposes.

5

September 30, making the notice of appeal due on December 3. *See id.* R. 26.1(a) (notice of appeal must be filed within 90 days after judgment if any party timely files motion for new trial). Although Guyaux's notice of appeal was filed 95 days after the trial court filed its order, it was filed within the 15-day period after the original deadline. *See id.* R. 26.3. Guyaux asserted that she sought additional time to file the notice of appeal because her counsel had mistakenly calendared the filing deadline as December 18.

The Mitchells filed a motion to dismiss Guyaux's appeal for lack of jurisdiction. They argued that Guyaux's notice of appeal was untimely because the trial court signed the order on May 15, and Guyaux had not attempted to invoke the remedy set forth in Texas Rule of Civil Procedure 306a. Rule 306a(4) provides that if a party does not receive notice within twenty days of the signing of an appealable order, then periods that begin on the date of judgment will run from the date the party receives notice or has actual knowledge, "but in no event shall such periods begin more than ninety days after the original judgment or other appealable order was signed." *See also* Tex. R. App. P. 4.2(a)(1) (establishing same timeline). The Mitchells argued that because the 90th day after May 15 was August 13, the last day that Guyaux could have filed a motion for new trial or a notice of appeal was September 12, had she followed the procedure set forth in Rule 306a(5) to establish that she was eligible for an extension. Because Guyaux had not followed that procedure, the Mitchells asserted that the deadline for her to file her notice of appeal was June 15.

In response, Guyaux argued that the Mitchells ignored the fact that the new matter, No. 20-1360-C425, was not actually severed until September 4, and although severance is typically final upon the judge's signature, it may be conditioned on a future event. *See Doe v. Pilgrim Rest Baptist Church*, 218 S.W.3d 81, 82 (Tex. 2007) (holding that trial court had conditioned severance on party's compliance with court clerk's procedure, which included payment of filing fee). Here,

6

Guyaux asserted, the trial court's statement expressly conditioned the finality and appealability of the order on issuance of the new cause number, which did not occur until September 4. In reply, the Mitchells addressed Guyaux's argument about the finality of the severance order being conditional on the issuance of a new cause number by asserting that the language in the trial court's severance order was like the language used in the severance order in *AZS Holding Co. v. Khosh-Sirat*, No. 05-18-00845-CV, 2018 WL 5278730, at *1, (Tex. App.—Dallas Oct. 24, 2018, no pet.) (mem. op.), and also citing *Arlitt v. Ebeling*, No. 03-18-00646-CV, 2018 WL 6496714, at *3 (Tex. App.—Austin Dec. 11, 2018, no pet.) (mem. op.), which held that the order was final and appealable upon signature of the judge. In her sur-reply, Guyaux argued that unlike the language in *AZS*, which the court concluded "did not condition the severance on the creation of a separate physical file *or any other future* event," 2018 WL 5278730, at *1 (emphasis added), the language in the order here conditions finality on the clerk's assignment of a new cause number that "will constitute a final and appealable judgment disposing of all parties and claims herein."

On February 2, 2021, by notice letter, the Court granted Guyaux's motion for extension of time to file her notice of appeal and denied the Mitchells' motion to dismiss for want of jurisdiction.

**Jurisdictional analysis**

The jurisdictional issue previously considered by the Court and reurged by the Mitchells is whether the trial court expressly conditioned the finality of its order on a future event. If the trial court did not do so, then the severance was final upon the judge's signing of the order

7

on May 15. Because Guyaux did not invoke the Rule 306a(5) procedure (a fact she does not dispute), her notice of appeal would be untimely.

The Mitchells argue that the Court "should refuse to extend the exception established in *Doe v. Pilgrim Rest Baptist Church*, 218 S.W.3d 81, 82 (Tex. 2007)." The Mitchells contend that because the Texas Supreme Court has established that "an order granting a severance with a judgment in the cause ordered severed is effective when signed," even if the district clerk does not create a separate file with a different cause number, *see McRoberts v. Ryals*, 863 S.W.2d 450, 452-53 (Tex. 1993), this Court should not read the trial court's order as conditioning finality and appealability upon the assignment of the new cause number.

Our decision is based on the trial court's order, which uses future-looking language in two places relating to the severance:

- The trial court "GRANTS the Mitchell Defendants' Motion to Sever and severs the claims by and against the Mitchell Defendants[] in order that this Order *may become* a final, appealable judgment."

- "It is further ORDERED that the claims by and against the Mitchell Defendants are severed and *orders the clerk of the Court to assign the severed action the separate Cause No. _____ which **will constitute** a final and appealable judgment, disposing of all parties and claims therein.*"

(Emphases added.) As noted above, in *McRoberts*, the Texas Supreme Court established that "an order granting a severance with a judgment in the cause ordered severed is effective when signed," even if the district clerk does not create a separate file with a different cause number. *Id.* The supreme court also noted, however, that:

> [o]f course, the trial court could have conditioned the effectiveness of the severance *on a future certain event, such as the clerk's **assigning a cause number** and payment of fees associated with the severance by the party requesting it.* The order

under consideration here did neither. Clearly the better practice would be for the trial judge to assign a new cause number as part of the severance order, or at least contemporaneously with it.

*Id.* at 453 n.3 (emphases added). Following *McRoberts*, courts generally conclude that the day the severance order is signed is the date that triggers appellate deadlines, unless "the severance order expressly contemplates some future action needed before the severed judgment will be final." *Lee v. One World Bank*, No. 05-16-00688-CV, 2016 WL 4273634, at *1 (Tex. App.—Dallas Aug. 15, 2016, pet. denied) (mem. op.) (citing *Diversified Fin. Sys., Inc. v. Hill, Heard, O'Neal, Gilstrap & Goetz, P.C.*, 63 S.W.3d 795 (Tex. 2001) (per curiam)).

In *Diversified Financial Systems*, for example, the trial court's order "stated that separate action should 'proceed as such to final judgment or other disposition in this Court [under a new style and cause number],'" and the supreme court held this language "clearly precluded a final judgment in the severed action until the later judgment was signed." 63 S.W.3d at 795. Likewise, in *Martinez v. Humble Sand & Gravel*, 875 S.W.2d 311, 313-14 (Tex. 1994) (per curiam), the supreme court concluded that a severance order permitting additional defendants to be added to the severed action after the severance order was signed was an interlocutory order.

The language in the severance order at issue here is most similar to the language in the *Doe* severance order. 218 S.W.3d at 81. The trial court in *Doe* ordered "that all claims against [the Church] are severed from this cause into cause number *to be assigned* [and restyled] on the docket of this Court *upon compliance with the District Clerk's procedure*." *Id.* The italicized portions were handwritten on the order, and the parties agreed that the procedure required payment of a filing fee. *Id.* Doe did not pay the filing fee until 123 days after the severance order was signed, leading the court of appeals to dismiss the appeal for want of jurisdiction because it was

9

filed more than ninety days after the order was signed. *Id.* The supreme court held that the court of appeals erred by construing "the handwritten condition to apply only to the renumbering and restyling of the severed case, not to the severance itself, but we see no reason why the trial court would merely condition further clerical action, and not the severance itself, on compliance with applicable procedures." *Id.* (citation omitted). Similarly here, the trial court's forward-looking language conditions the severance on the future action that it ordered the clerk to take—"*to assign the severed action the separate Cause No. _____*." According to the order's language, only then did the order constitute a final and appealable judgment, disposing of all parties and claims therein.

This case differs from cases that have found that leaving the cause number blank did not affect the finality of the order because unlike those cases, the trial court's order here conditioned finality upon the clerk's future action. *See, e.g.*, *Arlitt*, 2018 WL 6496714, at *3 (concluding that "blank spaces for the severed cause number on [severance] order [did] not affect its finality" when order stated it was "final and appealable as of the date of this order"); *AZS*, 2018 WL 5278730, at *1 (holding trial court's order did not condition finality of severance order on creation of separate physical file or any other future event and thus delay in assignment of cause number did not affect finality of unconditional severed judgment); *Lee*, 2016 WL 4273634, at *1 (holding same as *AZS*); *see also VicNRG LLC v. FCStone, LLC*, No. 14-15-00194-CV, 2015 WL 1933376, at *1 (Tex. App.—Houston [14th Dist.] Apr. 28, 2015, pet. denied) (mem. op.) (per curiam) (concluding that severance order that did not indicate that further proceedings were to be conducted in severed action was final and appealable because it disposed of all severed parties and claims). None of the orders in those cases contained conditional language like the language in this order.

10

While the better practice would be for the trial judge to assign a new cause number as part of the severance order, as the court pointed out in *McRoberts*, the court also explicitly stated that a trial court can condition "the effectiveness of the severance on a future certain event, such as the clerk's assigning a cause number." 863 S.W.2d at 453 n.3. That is exactly what the trial court did here. Accordingly, the Court granted Guyaux's motion for extension of time to file her notice of appeal and denied the Mitchells' motion to dismiss.

## ANALYSIS

The Mitchells moved for summary judgment on Guyaux's affirmative claims, as well as on the two bases for their own claims for declaratory relief, which concern the same legal issues: (1) whether their planned improvements complied with the Restrictive Covenants and (2) whether they obtained approval for construction of the improvements. On appeal, Guyaux challenges the trial court's order in three issues. In her first issue, she asserts that the trial court erred by granting the Mitchells' summary-judgment motion because (1) the trial court relied on incompetent evidence, (2) the Mitchells did not establish as a matter of law their compliance with the Restrictive Covenants, and (3) the Mitchells failed to establish as a matter of law that the Committee granted them a variance. In her second issue, Guyaux contends that the trial court erred by awarding the Mitchells attorneys' fees under the UDJA. Guyaux argues in her third issue that the trial court erred by granting the Mitchells' severance request because the severed and non-severed claims are so interwoven that they involve the same facts and issues.

### Standard of review

We review the trial court's decision to grant summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a summary-judgment

11

motion, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 278 (Tex. 2018). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When the trial court does not specify the grounds for granting the motion, we must uphold the judgment if any ground asserted in the motion and preserved for appellate review is meritorious. *Id.* at 216.

## I. The trial court did not err by granting summary judgment

### A. The relevant summary-judgment evidence was competent

Guyaux contends that the trial court erred by relying on incompetent evidence to support its summary judgment. She argues that Aaron's affidavit contains statements which were not based on his personal knowledge and statements based on hearsay. We address each of Guyaux's evidentiary complaints in turn.

We apply an abuse-of-discretion standard when reviewing a trial court's decision to admit or exclude summary-judgment evidence. *Houle v. Capital One Bank (USA), N.A.*, 570 S.W.3d 364, 368-69 (Tex. App.—El Paso 2018, pet. denied). The same evidentiary standards that apply in trials control the admissibility of evidence in summary-judgment proceedings. *Seim v. Allstate Tex. Lloyds*, 551 S.W.3d 161, 163 (Tex. 2018). Whether to admit or exclude evidence is a matter committed to the trial court's sound discretion. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

12

Guyaux objects to Aaron's use of the terms "guest house" and "guest quarters" in his affidavit, asserting that he lacks personal knowledge of how the Mitchells' planned improvements constitute a "guest house" or "guest quarters," and complaining that he does not reference a standard for what those terms mean. As noted above, the Restrictive Covenants allow "guesthouses" that are limited to 750 square feet and one bathroom. The Mitchells' counterclaim and their defense to the lawsuit is that their planned improvements comply with the Restrictive Covenants' requirements for guesthouses. Aaron's use of the term in his affidavit makes reference to those Restrictive Covenants' requirements and is based on his personal knowledge of the Mitchells' planned improvements.

Guyaux also contends that Aaron lacked personal knowledge of whether the other three Mitchells purchased the property because it had the detached garage that would allow for construction of a guesthouse, as he attested. The Mitchells' collective pre-purchase intentions to make improvements have no bearing on the legal issues in the case and thus no bearing on whether the trial court properly granted summary judgment. But even if they did, at a minimum, Aaron had personal knowledge of his own reasons for purchasing the property.

Finally, Guyaux asserts that because (1) the Mitchells offered no business-records or other affidavit to establish the validity, credibility, or accuracy of the drawings or the application that Aaron attested he submitted to the Committee and (2) they only offered the HOA president's email as evidence of the Committee's approval of the plans, Aaron's affidavit "does not and cannot support the validity or accuracy of the attached plans or the approval process engaged [in] by the [Committee] as required by the [Restrictive Covenants]." However, despite this assertion that Aaron's affidavit does not support the validity or accuracy of the attached plans, Guyaux does not appear to assert that the plans are not an accurate representation of the Mitchells' planned

13

improvements, that the plans are not the same plans that were submitted, or that they are not the same plans the Committee approved. Instead, Guyaux's complaints about the plans and the email attached to Aaron's affidavit challenge whether the trial court should have viewed this evidence as establishing that the Mitchells followed the proper procedure under the Restrictive Covenants for submitting their plans to and requesting a variance from the Committee or that the Committee followed the proper procedure when approving the plans—these are not complaints about the competency of the summary-judgment evidence.

To the extent that Guyaux contends these documents lack authentication and thus are inadmissible hearsay, we disagree. Aaron's testimony is sufficient to authenticate the documents; he has personal knowledge that he sent the plans to the Committee and that he received the approval email from the HOA president. *See* Tex. R. Evid. 901(b)(1) (establishing that evidence may be authenticated by testimony of witness with knowledge that item is what it is claimed to be). And the documents themselves are competent evidence to establish two facts: that the Mitchells submitted these plans to the Committee and that they received approval of the plans from the Committee.[8] *See Texas Prop. & Cas. Ins. Guar. Ass'n ex rel. Petrosurance Cas. Co. v. Brooks*, No. 03-10-00428-CV, 2011 WL 3890405, at *7 (Tex. App.—Austin Aug. 31, 2011, no pet.) (mem. op.) (holding that statements at issue were "words of legal significance" and "[did] not constitute hearsay because the mere fact that the words were uttered is relevant to the fact to be established"). "[O]ut of court utterances are admissible when they are the basis of a cause of action." *See Irving Lumber Co. v. Alltex Mortg. Co.*, 446 S.W.2d 64, 71 (Tex. App.—Dallas 1969),

---

[8] In her own affidavit, Guyaux attests that "[o]n or about September 19, 2019, the President of the [HOA] called for and obtained a simple majority of the new [Committee] members to approve the Mitchells' construction plans to build the permanent second family residence."

14

*aff'd*, 468 S.W.2d 341 (Tex. 1971). In this case, the Mitchells' submission of the plans to the Committee and the Committee's approval of the plans "constitute a necessary part of the cause of action or defense" and "are 'operative' facts or part of the 'ultimate issue.'" *Williams v. Jennings*, 755 S.W.2d 874, 885 (Tex. App.—Houston [14th Dist.] 1988, writ denied).

Accordingly, we conclude that the trial court did not abuse its discretion by relying upon the challenged summary-judgment evidence to support its grant of the Mitchells' summary-judgment motion.

### B. The Mitchells established as a matter of law their compliance with the Restrictive Covenants

The central issue in this case is whether the Mitchells' planned improvements constitute a "guesthouse" or a "permanent residence" (also referred to as "primary residence" and "main house"), as those structures are defined by the Restrictive Covenants. We review de novo a trial court's interpretation of restrictive covenants. *Tarr*, 556 S.W.3d at 279. We also review de novo whether restrictive covenants are violated by a particular set of facts. *See Boatner v. Reitz*, No. 03-16-00817-CV, 2017 WL 3902614, at *3 (Tex. App.—Austin Aug. 22, 2017, no pet.) (mem. op.) (citing *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied)).

The general rules of contract construction govern our interpretation of restrictive covenants. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998). Whether restrictive covenants are ambiguous is a question of law. *Id.* When interpreting restrictive covenants, the court's primary task is to determine the intent of the drafters from the instrument's language. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 658 (Tex. 1987). To ascertain the drafters' intent, courts must examine the covenants as a whole in light of the circumstances present when the parties entered the agreement. *Pilarcik*, 966 S.W.2d at 478. We must give words and phrases used in the covenants

15

their commonly accepted meaning; "[t]he words used in the restriction, and the restriction as a whole, may not be enlarged, extended, stretched or changed by construction." *Wilmoth*, 734 S.W.2d at 657.

Covenants, like contracts, are unambiguous as a matter of law if they can be given a definite or certain legal meaning. *Pilarcik*, 966 S.W.2d at 478. An unambiguous covenant must be "liberally construed to give effect to its purpose and intent." Tex. Prop. Code § 202.003(a); *Jennings v. Bindseil*, 258 S.W.3d 190, 195 (Tex. App.—Austin 2008, no pet.). But if restrictive covenants are susceptible to more than one reasonable interpretation, they are ambiguous. *Pilarcik*, 966 S.W.2d at 478. "[W]e will resolve all doubts in favor of the free and unrestricted use of the property, strictly construing any ambiguity against the party seeking to enforce the restriction." *Zgabay v. NBRC Prop. Owners Ass'n*, No. 03-14-00660-CV, 2015 WL 5097116, at *2 (Tex. App.—Austin Aug. 28, 2015, pet. denied) (mem. op.) (citing, *e.g.*, *Wilmoth*, 734 S.W.2d at 657). "Covenants restricting the free use of land are not favored by the courts, but when they are confined to a lawful purpose and are *clearly worded*, they will be enforced." *Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 308 (Tex. App.—Fort Worth 2001, no pet.). The party seeking to enforce a restrictive covenant bears the burden of showing that the restriction is valid and enforceable. *Id.* "Mere disagreement over the interpretation of a restrictive covenant does not render it ambiguous." *Tarr*, 556 S.W.3d at 280 (quoting *Buckner v. Lakes of Somerset Homeowners Ass'n*, 133 S.W.3d 294, 297 (Tex. App.—Fort Worth 2004, pet. denied)). "No construction, no matter how liberal, can construe a property restriction into existence when the covenant is silent as to that limitation." *Id.* at 285.

Guyaux contends that the Mitchells failed to establish as a matter of law that their planned improvements do not violate the Restrictive Covenants. The provisions at issue are found in Article II, "Restrictions on Lots":

> 2. <u>Single Family Dwellings</u>. No more than *one single family dwelling* shall be erected on a Lot. *Guesthouses* are allowed limited to 750 square feet & limited to one bathroom. Lot owners may construct the *guesthouse* first but in no case shall the total construction time for building *guesthouse*, *main house* & garage last longer than 12 months from start of construction. This provision applies to all construction except barns, outbuildings, fences, etc.
>
> 3. <u>Size and Construction of Residences</u>. Each *permanent residence* constructed on a lot shall have a living area of no less than twenty five hundred (2500) square feet cooled and heated spaces, exclusive of garages, carports and porches. Two story homes shall have at least 1200 square feet on the bottom floor. Separate garage buildings, storage facilities, *servant's quarters and guest houses* shall be of all new material. Three (3) car garages are preferred, however a minimum of a two car garage *either attached or detached* shall be required. All construction shall have the prior written approval of the Architectural Control Committee. The location and specifications of the septic system shall be expressly approved in writing by the Williamson County Health Department prior to the beginning of the construction of the *primary residence*. All barns and outbuildings shall be built of the same materials as the *main house*.

(Emphases added.) Both Guyaux and the Mitchells maintain that these provisions are unambiguous.[9] Guyaux acknowledges, and the Mitchells agree, that the provision allowing guesthouses with dimensional restrictions is a structural restriction, not a restriction on property use. *See Tarr*, 556 S.W.3d at 286 (explaining that "courts have often distinguished between *use* restrictions and *structural* restrictions and have declined to conflate the two").

---

[9] We are not bound by the parties' conclusions about the ambiguity of the Restrictive Covenants. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).

Guyaux asserts that the use of the property is not the issue here and that her complaint is that the Mitchells are violating the structural restrictions by building a "second permanent residence" because no more than one single-family dwelling may be built on the lot.[10] However, her argument ignores the fact that the Restrictive Covenants define both "permanent residence" (also variously termed as "main house" and "primary residence") and "guesthouse" exclusively by their structural restrictions. The "permanent residence" must have a living area that consists of at least 2,500 square feet of cooled and heated spaces, "exclusive of garages, carports and porches," while a "guesthouse" is limited to 750 square feet and one bathroom. As Guyaux acknowledges, the Restrictive Covenants do not place any use restrictions on these buildings—there are no limitations on who may use the buildings or for how long the buildings may be used.

As the Texas Supreme Court pointed out in *Tarr*, when we are analyzing the drafters' intent, we must determine whether the covenant's restrictions apply to the nature of the physical structure to be built on the property or to the use of the building. *Id.* Despite her assertion that use of the property is not the issue here and that she is only arguing a structural violation, Guyaux contends that because the Mitchells have admitted that the two elder Mitchells will live in the renovated area of the garage—that is, because of how they will use the building—the planned improvement is therefore a permanent residence, not a guesthouse. The implication of Guyaux's argument is that the names given to the structures constrain the manner in which the structures may be used. She contends that based on the dictionary definition of a "guest" as "a person to

___

[10] In the affidavit attached to her summary-judgment response, Guyaux attested that "the Mitchells have always represented to the [Committee] that they sought to build a second permanent residence, to permanently house the two elder Mitchells, by renovating the existing garage/workshop on their Lot," and she alleges that the Mitchells' planned improvements therefore violate the mandate of "one single family dwelling" on each lot.

18

whom hospitality is extended," owners cannot be guests, and thus the elder Mitchells may not stay in the guesthouse.[11]

We disagree. The drafters' use of the term "guesthouse" to distinguish smaller, secondary housing units on the property from the "single family dwelling"/"permanent residence"/"primary residence"/"main house" does not constitute a "clearly worded" use restriction that would preclude the property owners from staying in buildings on their own property other than the main house.[12] And even if we were to determine that the term "guesthouse" is ambiguous, we would be required to interpret it in favor of the Mitchells' free and unrestricted use of the property. *See Wilmoth*, 734 S.W.2d at 657 (requiring ambiguities to "be resolved in favor of the free and unrestricted use of the premises" and restrictive covenants to be construed strictly against the party seeking to enforce them).

---

[11] Guyaux also emphasizes that the building is a prohibited "*permanent* residence," implying that the length of time and non-transitory nature of the Mitchells' proposed stay in the planned improvement is also a violation of the Restrictive Covenants. However, she does not identify any provision in the Restrictive Covenants establishing a maximum length of time that someone may stay in a guesthouse. As explained above, the Restrictive Covenants define both the terms "permanent residence" and "guesthouse" by structural restrictions, not by the length of time a person stays in the structure.

[12] Similarly, we do not construe the drafters' reference to "servant's quarters" to mean smaller secondary buildings that can be occupied *only* by employees who serve the family living in the "main house," absent a clearly worded use restriction to that effect. Nor would a "mother-in-law suite" require occupancy only by an owner's mother-in-law in the absence of an express restriction. It would be an absurd result to conclude that owners may not stay in buildings on their own property and would conflict with the directive that we interpret ambiguous provisions in favor of the free and unrestricted use of property. *See, e.g.*, *Frost Nat'l Bank v. L & F Distributors, Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) ("We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)); *see also Lane v. Travelers Indem. Co.*, 391 S.W.2d 399, 402 (Tex. 1965) (determining it would be unreasonable to conclude that parties to insurance contract intended its provisions to lead to absurd results).

19

Guyaux's argument in essence is that if the owners stay in a building that meets the structural definition of a guesthouse, their presence converts the building to a prohibited second "single family dwelling." The Restrictive Covenants unambiguously define both the "single family dwelling"/"permanent residence"/"primary residence"/"main house" and the smaller secondary "guesthouse"/"servant's quarters" in terms of the buildings' square footage. The Restrictive Covenants contain no use restriction whatsoever that limits who may stay in either type of building or that places time limitations on a person's stay in either type of building. We cannot liberally "construe a property restriction into existence when the covenant is silent as to that limitation." *Tarr*, 556 S.W.3d at 286. We conclude that the Restrictive Covenants unambiguously define "permanent residence" (and its variations, "single family dwelling"/"primary residence"/"main house") and "guesthouse" (and "servant's quarters") by their structural restrictions, not by any use restrictions.

Guyaux also argues that the Mitchells' plan to renovate the existing 1,368 square-foot garage with a 750 square-foot sectioned-off living space is "hardly the contemplated separate guesthouse described by the [Restrictive Covenants]," asserting that the Restrictive Covenants "expressly provide for the permission (and structural requirements) <u>for a separate guesthouse</u> in addition to a garage and a main house." However, there is no language in the Restrictive Covenants that requires a guesthouse to be separate from the garage. Instead, Article II, ¶ 3 expressly states: "Three (3) car garages are preferred, however a minimum of a two car garage *either attached or detached* shall be required." (Emphasis added.) There is no requirement that an attached garage be attached to the primary residence and no prohibition on a garage being attached to a guesthouse.

The Restrictive Covenants unambiguously allow one large "single family dwelling"/"main residence" (which must be at least 2,500 square feet), an unspecified number of "storage facilities, servant's quarters and guest houses," as well as barns and outbuildings, and they require at least a two-car garage that may be attached or detached. Contrary to Guyaux's argument, allowing two owners to reside in a guesthouse as defined by the structural requirements of the Restrictive Covenants does not nullify the provision allowing only one "single family dwelling"/"permanent residence" per lot. The Restrictive Covenants contemplate that property owners may have a compound with one large main house and multiple other outbuildings, as long as those other buildings are built of all-new material, and the Restrictive Covenants impose no restrictions on the use of those buildings by certain people or for certain time periods. We conclude that the Mitchells established as a matter of law that their planned improvements constituted a "guesthouse" as that term is unambiguously defined in the Restrictive Covenants, and thus that the planned improvements did not violate the limit of "one single family dwelling"/"permanent residence" per lot. We overrule Guyaux's first issue.[13]

---

[13] As an alternative ground for summary judgment, the Mitchells argued that even if the trial court concluded that their planned improvements violated the Restrictive Covenants, it is undisputed that the Mitchells obtained written approval of their planned improvements from the HOA, which has authority under the Restrictive Covenants to authorize variances to the deed restrictions. Relying on the Texas Supreme Court's decision in *Pilarcik*, 966 S.W.2d at 480, and on Property Code Section 202.004, the Mitchells contend that because they actually obtained written approval from the HOA for the planned improvements and because the HOA's exercise of discretionary authority is presumed reasonable, it is immaterial whether they complied with the prerequisites for obtaining approval under the restrictive covenants. *See Pilarcik*, 966 S.W.2d at 480 (concluding that because committee had power to waive restriction and granted written waiver to homeowners, "it [was] immaterial whether [homeowners] complied with the [restrictive covenants'] prerequisites for obtaining approval"); *see also* Tex. Prop. Code § 202.004 (establishing that property owners' association's exercise of discretionary authority concerning restrictive covenant "is presumed reasonable" unless court determines by preponderance of evidence that it "was arbitrary, capricious, or discriminatory"). Under *Pilarcik*, even if the

**II.     The trial court did not err by awarding the Mitchells attorneys' fees under the UDJA**

In her second issue, Guyaux challenges the trial court's award of reasonable and necessary attorneys' fees in the amount of $14,662 under the Uniform Declaratory Judgments Act (UDJA).  *See* Tex. Civ. Prac. & Rem. Code § 37.009 (allowing trial court to award costs and attorneys' fees in any UDJA proceeding).  The trial court granted the Mitchells' traditional summary-judgment motion on Guyaux's affirmative claims and their motion on their declaratory-judgment claims, finding that the planned improvements were allowed under the Restrictive Covenants.  Guyaux contends that the Mitchells impermissibly sought declaratory relief for matters already before the trial court and thus the trial court was precluded from awarding them attorneys' fees under the UDJA.  In response, the Mitchells assert that (1) because Guyaux asserted a claim for declaratory relief, too, the trial court had discretion to award attorneys' fees that it determined were reasonable, necessary, equitable, and just; and (2) because they sought declaratory judgment that was independent of any relief sought by Guyuax, the trial court had discretion to award fees.

In any proceeding under the UDJA, the court may award costs and reasonable and necessary attorneys' fees as are equitable and just.  *Id.*  The Act "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law."  *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).  Accordingly, we will not disturb the trial court's award of attorneys' fees under the Act unless an abuse of discretion is shown.  *See id.*

Mitchells' planned improvements violate the Restrictive Covenants, the HOA's approval would constitute a variance, and the trial court could have granted summary judgment on this ground.

22

In her petition, Guyaux sought a declaration that the Mitchells sought to "construct a permanent second family home in an external commercial garage/workshop" in violation of the Restrictive Covenants and injunctive relief to enjoin the construction. The Mitchells' counterclaim requested a declaration stating "(a) That the guesthouse is permitted under the [Restrictive Covenants]; or (b) Alternatively, even if the guesthouse is not permitted under the [Restrictive Covenants], the [Committee] has properly granted a variance from the restrictions under Article III, Section 4 of the [Restrictive Covenants]." Guyaux relies on this Court's opinion in *Boatner*, 2017 WL 3902614, at *7, to support her contention that the Mitchells are precluded from recovering attorneys' fees under the UDJA because their counterclaim sought duplicative relief for issues already pending before the trial court and merely restated their defense.

The *Boatner* case differs from this case, however, because there the trial court was not faced with competing UDJA claims; the plaintiff had sued only for damages and injunctive relief and the defendants had pled a counterclaim seeking relief under the UDJA. *Id.* at *1. We determined on appeal that the trial court had properly denied the defendants' counterclaim, and we refused to remand for a determination of attorneys' fees because the counterclaim was duplicative of issues already before the court. *Id.* at *7. In contrast, both sides here filed UDJA claims. Thus, the Mitchells argue, the trial court had discretion to award attorneys' fees to the Mitchells for their defense of Guyaux's declaratory-judgment claim.

We agree. "[I]t is appropriate to award attorneys' fees to the prevailing party in a declaratory judgment action, provided that the trial court believes such fees to be reasonable and necessary and the award of such fees to be equitable and just . . . ." *Sierra Crest Homeowners Ass'n, Inc. v. Villalobos*, 527 S.W.3d 235, 249 (Tex. App.—El Paso 2016, no pet.) (explaining that trial courts may sometimes award fees to non-prevailing party and affirming trial court's

23

award of attorneys' fees to both parties when jury made findings in favor of both parties). Guyaux does not contend that the attorneys' fees are not reasonable and necessary, and she does not point to anything in the record that establishes that the fees are inequitable and unjust. We conclude that even if the Mitchells' counterclaim had been duplicative of issues already raised by Guyaux in this case (an issue that we do not need to reach), because Guyaux sought affirmative relief under the UDJA, the trial court did not abuse its discretion by awarding attorneys' fees under the Act to the Mitchells for their defense against Guyaux's declaratory-judgment claim. *See Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 916, 920 (Tex. 2015) (holding that trial court was authorized to enter judgment awarding defendant its attorneys' fees under UDJA when both plaintiff and defendant had pled for declaratory relief and defendant pled for recovery of its fees). We overrule Guyaux's second issue.[14]

III. **The trial court did not err by granting the Mitchells' severance request**

In her third issue, Guyaux contends that the trial court abused its discretion by granting the Mitchells' severance request. A trial court has broad discretion in the matter of severance and consolidation of causes, and the trial court's decision to grant a severance will not be reversed unless it has abused its discretion. *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 693 (Tex. 2007); *Guaranty Fed. Savs. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990); *see also* Tex. R. Civ. P. 41 ("Any claim against a party may be

---

[14] We note that in her reply brief, Guyaux argues for the first time that the Mitchells also are not entitled to conditional appellate attorneys' fees because they cannot obtain attorneys' fees under the UDJA for matters already pending before the trial court and because they cannot otherwise establish entitlement based on Guyaux's issues presented on appeal. To the extent that Guyaux intends this to be a separate issue presented on appeal, because we have concluded that the trial court did not err by awarding attorneys' fees under the UDJA to the Mitchells, we overrule it.

severed and proceeded with separately."). The controlling reasons for allowing a severance are doing justice, avoiding prejudice, and furthering convenience. *Guaranty Fed. Savs.*, 793 S.W.2d at 658. A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *In re State*, 355 S.W.3d 611, 614 (Tex. 2011) (orig. proceeding). The trial court has abused its discretion and reversal is warranted if any one of these three criteria are not met. *See, e.g., State Dept. of Highways & Pub. Transp. v. Cotner*, 845 S.W.2d 818, 819 (Tex. 1993) (concluding trial court erred in severing claim of driver in car-accident case from passenger's case because severed claim and remaining action was too interwoven and involved same facts and issues).

Guyaux does not dispute that the severance satisfies the first two criteria of the test—that the controversy involves more than one cause of action and that the severed claims against the Mitchells would be the proper subject of a lawsuit if independently asserted. Guyaux asserts that the trial court abused its discretion by severing the Mitchells' case from her case against the HOA because the severed and non-severed claims are so interwoven that they involve the same facts and issues. *See In re State*, 355 S.W.3d at 614. She argues that all causes of action in this severed case "relate to the Mitchells' application for and construction of their second permanent residence and its compliance with the [Restrictive Covenants]" and that written discovery, depositions, and motion practice will all relate to the Mitchells' compliance with the Restrictive Covenants; she further contends that her non-severed claims against the HOA for its breaches of fiduciary duty, seeking declaratory relief relating to the HOA's alleged usurping of the Committee's authority and approving the Mitchells' application, will relate to the same issues.

25

We disagree with Guyaux's assessment of the interwoven nature of the severed and non-severed cases. Her claims against the Mitchells are that the planned improvements violate the Restrictive Covenants, and she seeks declaratory relief to that effect and injunctive relief against the construction of the planned improvements. Her claims against the HOA are for breaches of fiduciary duty, involving allegations that the HOA has usurped the role of the Committee, acted in a self-dealing manner, and actively sought to undermine the enforceability of the Restrictive Covenants. She seeks the following declaratory relief against the HOA:

a.       The HOA has no power to usurp the ACC's authority to determine whether improvement applications can or cannot be approved;

b.       The HOA's attempt in September of 2019 to replace the ACC was a nullity and void ab initio; and,

c.       Neither the HOA, nor the ACC, have the authority to approve the Mitchells' construction application which seeks the construction of a second permanent family residence on the same lot as the single family residence.

While Guyuax's claims in the two cases involve some overlap, they are not so interwoven that they involve the *same* facts and issues. While some of the same facts will be relevant in both cases, the legal issues involved in Guyaux's claims against the Mitchells differ markedly from the legal issues involved in her claims against the HOA. While a trial court need not necessarily sever an interlocutory summary judgment, it has broad discretion in determining whether severance should be granted. *Guidry v. National Freight, Inc.*, 944 S.W.2d 807, 812 (Tex. App.—Austin 1997, no writ). "Where summary judgment in favor of a single defendant is proper in a case with multiple defendants, severance of that claim is also proper so that it may be appealed." *Id.* (citing *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 526 (Tex. 1982)). Because we have upheld the trial court's summary judgment in favor of the Mitchells, we correspondingly hold the trial

26

court did not abuse its discretion by severing Guyaux's case against the Mitchells from her case against the remaining defendants. *See id.* We overrule Guyaux's third issue.

## CONCLUSION

Having overruled Guyaux's issues presented, we affirm the trial court's judgment.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   December 10, 2021